**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 23-cv-00181-NYW-NRN

MACY KATE BOUTIQUE, INC.,

      Plaintiff,

v.

FASHION ANGEL WARRIOR, LLC, and
SPOILED ROTTEN U.S.A., INC.,

      Defendants.

---

## ORDER ON MOTIONS TO DISMISS

---

This matter comes before the Court on the Motion to Dismiss for Lack of Personal Jurisdiction ("FAW Motion to Dismiss"), [Doc. 20, filed March 28, 2023], filed by Defendant Fashion Angel Warrior, LLC ("FAW"); and the Motion to Dismiss for Lack of Personal Jurisdiction ("Spoiled Rotten Motion to Dismiss"), [Doc. 25, filed April 6, 2023], filed by Defendant Spoiled Rotten U.S.A., Inc. ("Spoiled Rotten" and, with FAW, "Defendants"). Plaintiff Macy Kate Boutique, Inc. ("Plaintiff" or "MKB"), has responded in opposition, [Doc. 26; Doc. 27], and Defendants have replied, [Doc. 30; Doc. 31]. The Court finds that oral argument would not materially assist in the disposition of the Motions to Dismiss. Upon review of the Parties' briefing, the entire docket, and the applicable case law, this Court respectfully **DENIES** the FAW Motion to Dismiss and **DENIES** the Spoiled Rotten Motion to Dismiss.

### BACKGROUND

The following overview is based on the allegations in the First Amended Complaint and

Jury Demand ("First Amended Complaint"), [Doc. 11, filed February 7, 2023].[1]  MKB, a Colorado corporation based in Castle Rock, Colorado, designs and sells children's clothing.  [*Id.* at ¶¶ 1–2].  In August 2020, MKB entered into an agreement—the Project Management/Retainer Contract ("PM Contract")—with FAW, a New Jersey fashion and marketing consulting agency that works with start-up designers and businesses.  [*Id.* at ¶¶ 5, 22]; *see also* [Doc. 11-1 (PM Contract)].  The PM Contract was signed by Rachael Stone ("Ms. Stone"), who is MKB's manager, and by Christine Daal ("Ms. Daal"), who is FAW's president and sole member.  [Doc. 11 at ¶¶ 3, 6]; *see also* [Doc 11-1 at 4].

Under the PM Contract, MKB made monthly payments to FAW, which "would source, order, and attend to quality control of the manufacturing of children's clothing using fabrics and patterns chosen by Plaintiff."  [Doc. 11 at ¶¶ 24, 29].  To manufacture the clothing under the PM Contract, FAW "subcontracted with" Spoiled Rotten, a New York corporation whose principal shareholder is Eric Beroff ("Mr. Beroff").  [*Id.* at ¶¶ 7–8, 26].  Plaintiff provided Defendants with at least $31,386.41 worth of fabric and made approximately $37,335.00 in monthly payments to FAW, among other costs incurred.  [*Id.* at ¶¶ 28, 30].

In 2021, MKB worked with Defendants to manufacture and obtain two shipments of clothing for retail sale.  First, in January 2021, Spoiled Rotten invoiced Plaintiff $41,386.00, before shipping, in connection with a shipment of children's clothing ("First Shipment").  [*Id.* at ¶ 35].  FAW received samples of the First Shipment from Spoiled Rotten for inspection purposes, and FAW employee Traci Kaye ("Ms. Kaye") was charged with quality control duties.  [*Id.* at ¶¶ 36–37].  The First Shipment reached MKB's Colorado store in late January 2021, and MKB started

---

[1] The Court discusses additional factual material submitted in connection with the Parties' briefing throughout the analysis below.

fulfilling customer orders with its contents. [*Id.* at ¶¶ 42–46]. Soon after, MKB began receiving complaints from customers related to "incorrect or inaccurate sizing," "improper sewing," "fraying due to poor craftmanship," and "incorrect or improper implementation of the designs." [*Id.* at ¶¶ 48–49]. MKB refunded these customers and was largely unable to resell the inventory from the First Shipment. *See* [*id.* at ¶¶ 50–52]. Defendants assured MKB that they would fix the problem, and MKB ordered additional clothing ("Second Shipment"). [*Id.* at ¶¶ 56–57].

In May 2021, Spoiled Rotten invoiced MKB $52,098.00, before shipping, for the Second Shipment, which Ms. Kaye was also required to inspect. [*Id.* at ¶¶ 58–59]. MKB received the Second Shipment at its store the next month and, this time, "carefully" checked the clothing for quality issues, allegedly finding the very same defects that marred the First Shipment. [*Id.* at ¶¶ 63–65]. Again, MKB was unable to sell most of the clothing in the Second Shipment, and it incurred various costs in connection with storing some items and modifying others for resale. [*Id.* at ¶¶ 68–69]. Defendants again attempted to allay Plaintiff's concerns, requesting that MKB place a third order, but Plaintiff declined. [*Id.* at ¶¶ 70–73]. After FAW allegedly refused Plaintiff's requests for mediation, [*id.* at ¶¶ 77–78], MKB filed this action on January 20, 2023, invoking this Court's diversity jurisdiction, [Doc. 1]. MKB amended its pleading the next month. *See* [Doc. 11].

The First Amended Complaint includes three claims for relief: (1) breach of contract against FAW, based on the PM Contract; (2) breach of contract against Spoiled Rotten, in MKB's alleged capacity as third-party beneficiary of an agreement between Spoiled Rotten and FAW; and (3) unjust enrichment against Spoiled Rotten. [*Id.* at 11–15]. MKB seeks damages to compensate it for losses and expenses incurred in connection with the First and Second Shipments. *See* [*id.* at 15–16]. Both Defendants have separately moved to dismiss, arguing that the Court lacks personal

jurisdiction over them.[2]

## LEGAL STANDARD

Rule 12(b)(2) of the Federal Rules of Civil Procedure allows a defendant to challenge the court's exercise of personal jurisdiction. Fed. R. Civ. P. 12(b)(2). "[P]laintiffs bear the burden of establishing personal jurisdiction." *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1069 (10th Cir. 2008). When, as here, a court decides a Rule 12(b)(2) motion to dismiss without holding an evidentiary hearing, "the plaintiff need only make a prima facie showing of personal jurisdiction to defeat the motion." *AST Sports Sci., Inc. v. CLF Distrib. Ltd.*, 514 F.3d 1054, 1057 (10th Cir. 2008); *see also id.* at 1056 ("[I]n the preliminary stages of litigation, the plaintiff's burden is light."). "The plaintiff may make this prima facie showing by demonstrating, via affidavit or other written materials, facts that if true would support jurisdiction over the defendant." *OMI Holdings, Inc. v. Royal Ins. Co. of Can.*, 149 F.3d 1086, 1091 (10th Cir. 1998). In considering this question, a court must accept all well-pleaded facts as true and resolve any factual disputes in favor of the plaintiff. *See Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995); *see also Wise v. Lindamood*, 89 F. Supp. 2d 1187, 1189 (D. Colo. 1999) (noting that the Court "must resolve all disputed facts and draw all reasonable inferences in the plaintiff's favor").

## ANALYSIS

Each Defendant has filed a motion to dismiss under Rule 12(b)(2). Because the First

---

[2] The FAW Motion to Dismiss does not contain the conferral certification required by this Court's Civil Practice Standard 7.1B(b). *See generally* [Doc. 20]; *see also* [Doc. 26 at 1]. In reply, FAW acknowledges its noncompliance but suggests that conferral could not have fixed the jurisdictional issue it alleges, as "the lack of personal jurisdiction over FAW in Colorado is not a pleading defect that Plaintiff could have cured by filing an amended complaint." [Doc. 30 at 1]. Plaintiff has not suggested otherwise, *see* [Doc. 26 at 1], so the Court will excuse this procedural issue but specifically advises the Parties that failure to confer is sufficient grounds for the Court to deny a motion without substantive review. *See, e.g.*, *Crocs, Inc. v. Effervescent, Inc.*, No. 06-cv-00605-PAB-KMT, 2017 WL 4368158, at *2 (D. Colo. Sept. 30, 2017).

Amended Complaint alleges different kinds of contact between each Defendant and the forum state, Colorado, the Court discusses each in turn. *See Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 781 n.13 (1984) ("Each defendant's contacts with the forum State must be assessed individually.").

## I.   Personal Jurisdiction

"The requirement that a court have personal jurisdiction flows from the Due Process Clause.  It represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty." *Peay v. BellSouth Med. Assistance Plan*, 205 F.3d 1206, 1210 (10th Cir. 2000) (cleaned up).  "To obtain personal jurisdiction over a nonresident defendant in a diversity action, a plaintiff must show that jurisdiction is legitimate under the laws of the forum state and that the exercise of jurisdiction does not offend the due process clause of the Fourteenth Amendment." *Far W. Cap., Inc. v. Towne*, 46 F.3d 1071, 1074 (10th Cir. 1995) (emphasis omitted).   However, "Colorado's long-arm statute, Colo. Rev. Stat. § 13-1-124, extends jurisdiction to the [United States] Constitution's full extent.  The personal jurisdiction analysis here is thus a single due process inquiry." *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 903 (10th Cir. 2017) (citations omitted).

"To exercise jurisdiction in harmony with due process, defendants must have minimum contacts with the forum state, such that having to defend a lawsuit there would not offend traditional notions of fair play and substantial justice." *Shrader v. Biddinger*, 633 F.3d 1235, 1239 (10th Cir. 2011) (quotation and alteration omitted); *see also Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).  A defendant's contacts may give rise to general or specific personal jurisdiction. *See Intercon, Inc. v. Bell Atl. Internet Sols., Inc.*, 205 F.3d 1244, 1247 (10th Cir. 2000).   General jurisdiction arises when a defendant's contacts with the forum state are so continuous and systematic as to essentially render it "at home" in that state. *See Daimler AG v.*

*Bauman*, 571 U.S. 117, 139 (2014).  Specific jurisdiction is particular to the instant action and arises where a defendant purposefully directs its activities to residents of the forum, and the cause of action arises out of those activities.  *See Melea, Ltd. v. Jawer SA*, 511 F.3d 1060, 1066 (10th Cir. 2007).  Plaintiff concedes that this Court lacks general jurisdiction over Defendants, [Doc. 26 at 4; Doc. 27 at 4], so the Court focuses solely on specific jurisdiction in this Order.  More narrowly, because Plaintiff's causes of action sound in contract and its arguments for jurisdiction center on its relationships with FAW and Spoiled Rotten, the Court focuses on precedent concerning specific jurisdiction for purposes of contract claims and business relationships.

"Specific jurisdiction . . . is premised on something of a *quid pro quo*: in exchange for 'benefitting' from some purposive conduct directed at the forum state, a party is deemed to consent to the exercise of jurisdiction for claims related to those contacts." *Dudnikov*, 514 F.3d at 1078. The analysis turns on a host of nondispositive factors.  For example, a nonresident's contract with a forum resident is insufficient, by itself, to establish jurisdiction. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985).  Relatedly, "'[f]oreseeability' alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980).  And "[s]o long as a commercial actor's efforts are 'purposefully directed' toward residents of another State," the Supreme Court has "consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there." *Burger King Corp.*, 471 U.S. at 476 (quoting *Keeton*, 465 U.S. at 774).  Instead, "with respect to interstate contractual obligations, . . . parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." *Id.* at 473 (quoting *Travelers Health Ass'n v. Virginia*, 339 U.S. 643, 647 (1950)).

The "purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts." *Id.* at 475 (quotation omitted). Rather, "the contract relied upon to establish minimum contacts must have a 'substantial connection' with the forum state." *TH Agric. & Nutrition, LLC v. Ace Euro. Grp. Ltd.*, 488 F.3d 1282, 1288 (10th Cir. 2007) (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)); *see also Burger King Corp.*, 471 U.S. at 475 n.18 ("So long as it creates a 'substantial connection' with the forum, even a single act can support jurisdiction."). "To determine whether a nonresident defendant has purposefully established minimum contacts with the forum state by contracting with another party, we therefore examine 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *TH Agric. & Nutrition, LLC*, 488 F.3d at 1288 (quoting *Burger King Corp.*, 471 U.S. at 479). In this regard, "[p]hone calls, letters, facsimiles, and emails 'provide additional evidence that [a foreign defendant] pursued a continuing business relationship with [a plaintiff]." *AST Sports Sci., Inc.*, 514 F.3d at 1059 (quoting *Pro Axess v. Orlux Distrib., Inc.*, 428 F.3d 1270, 1278 (10th Cir. 2005)); *see also id.* ("[M]odern communications can eliminate the need for physical presence."). "In proper circumstances, even a single letter or telephone call to the forum state may meet due process standards." *Rambo v. Am. So. Ins. Co.*, 839 F.2d 1415, 1418 (10th Cir. 1988). "The proper focus for analyzing these contacts is whether they represent an effort by the defendant to 'purposefully avail[ ] itself of the privilege of conducting activities within the forum State.'" *Id.* at 1419 (alteration in original) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).

Finally, even if a defendant's minimum contacts with the forum state give rise to the cause of action at bar, courts may not exercise specific personal jurisdiction over a foreign defendant where doing so would offend "traditional notions of fair play and substantial justice." *Dudnikov*,

514 F.3d at 1071.  That inquiry implicates the following factors: "(1) the burden on the defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies."  *OMI Holdings, Inc.*, 149 F.3d at 1095.  "The reasonableness prong of the due process inquiry evokes a sliding scale: the weaker the plaintiff's showing on minimum contacts, the less a defendant need show in terms of unreasonableness to defeat jurisdiction."  *Benton v. Cameco Corp.*, 375 F.3d 1070, 1079 (10th Cir. 2004) (cleaned up).

## II.   FAW Motion to Dismiss

Seeking dismissal for lack of specific personal jurisdiction, FAW argues that "Plaintiff's injuries did not arise out of FAW's forum-related activities," because MKB's claims are based on "the quality of clothing products that were designed by the Plaintiff in Colorado, manufactured [i]n New York by Spoiled Rotten, inspected in New York by FAW, and then shipped to Colorado by Spoiled Rotten."  [Doc. 20 at 10]; *see also* [*id.* at 11 ("[A]ll of FAW's conduct supposedly giving rise to Plaintiff's claim occurred in other forums")].  MKB responds that FAW "solicited MKB's business and purposefully customized it[s] services to meet MKB's needs—thereby availing itself of Colorado's market."  [Doc. 26 at 7].  Construing the record favorably to MKB, and based on Plaintiff's "light" burden at this phase, *see AST Sports Sci., Inc.*, 514 F.3d at 1056, the Court respectfully disagrees with FAW.

The following contacts with Colorado, the forum state, are supported by Plaintiff's allegations, taken as true, and the materials submitted in connection with the FAW and Spoiled Rotten Motions to Dismiss.  Ms. Stone met Ms. Daal at a February 2020 textile convention in California, where they "discussed [MKB's] business generally, including that MKB was a

Colorado company," and Ms. Daal represented to Ms. Stone "that she could help sort through the production issues MKB was facing."[3]   [Doc. 26-1 at ¶¶ 2, 5–6].   As discussed above, FAW "provides mentoring and coaching services to individuals and businesses on how to succeed in starting or scaling up their own fashion business." [Doc. 20-1 at ¶ 3].   In a subsequent consultation call which Ms. Daal directed Ms. Stone to book, Ms. Daal told Ms. Stone "that FAW would be able to provide 'a la cart[e]' services to meet MKB's custom needs" and that MKB's "location in Colorado would not be a problem." [Doc. 26-1 at ¶¶ 6–8].   MKB and FAW subsequently entered into the PM Contract, which listed MKB's Colorado address on the first page and obliged FAW "to provide project management services" for a five-month period between August 2020 and January 2021.  [Doc. 11-1 at 2].   Despite the agreement's stated term, the allegations in the First Amended Complaint and materials submitted in connection with the Parties' briefing suggest that the relationship continued through at least July 2021.  *See, e.g.*, [Doc. 11 at ¶ 70].   Indeed, well after the PM Contract expired, Ms. Daal sent Ms. Stone an email referencing "the beginning," "the next round," and costing issues.  [Doc. 26-3 at 2].

Construed in Plaintiff's favor, the record suggests that its relationship with FAW consisted of FAW working closely with Plaintiff to develop its product lines and improve its brand, including by engaging Spoiled Rotten to fill Plaintiff's orders and receiving materials both from Plaintiff and Spoiled Rotten.  *See, e.g.*, [Doc. 20-5 at 2 (Ms. Kaye telling Ms. Stone to "have the cuttings sent straight to [Ms. Kaye]"); Doc. 20-1 at ¶ 16 (Ms. Daal declaring that "Ms. Kaye did inspect samples of [MKB's] garments"); Doc. 11-1 at 6.   Ms. Stone further states in her declaration that

---

[3] Ms. Daal's declaration attests that "MKB initiated the business relationship with FAW." [Doc. 20-1 at ¶ 7].   To the extent this gives rise to a dispute of fact, the Court must credit Plaintiff's account at this stage.  Moreover, in analyzing personal jurisdiction, this Court is less focused upon which entity initiated the business relationship between MKB and FAW, and more focused upon the overall conduct of the entities with respect to the business relationship.

FAW "even began to offer coaching for MKB's business operations." [Doc. 26-1 at ¶ 16]. And, when the relationship started to break down over alleged product defects with the Second Shipment, FAW encouraged MKB to make another order. *See* [Doc. 11 at ¶¶ 71–72].

Considering these facts, and Plaintiff's minimal burden, the Court concludes that, "[a]s is required for a finding of minimum contacts, the record reveals that the parties pursued a continuous course of dealing." *AST Sports Sci., Inc.*, 514 F.3d at 1059. The essence of the PM Contract, and FAW's interactions with Plaintiff, was FAW's commitment to work with MKB, a Colorado business, to develop its products and improve its brand, and, making inferences in Plaintiff's favor, the Parties' course of dealing lasted over a year. *See* [Doc. 26 at 6 (arguing that FAW's "heavy involvement" in the manufacturing process of "custom[]" goods for a Colorado business supports the exercise of jurisdiction)]. The PM Contract, alongside the Parties' communications and other commercial records, "evidence[s] the prior negotiations and future consequences of an intended continuing business relationship." *AST Sports Sci., Inc.*, 514 F.3d at 1058; *see also Pro Axess, Inc.*, 428 F.3d at 1277 (finding minimum contacts where, "[a]lthough the agreement between the parties was a single contract, fulfilling the contract required a continuing relationship based on the provision of services").

The Parties communicated extensively over several months in connections with MKB's product lines, as evidenced by billing records for Ms. Kaye that are replete with entries for communications with Ms. Stone, who was presumably in Colorado for most or all of these contacts. *See* [Doc. 26-2 at 2–6]. And FAW is alleged to have closely managed the manufacturing relationship with Spoiled Rotten, keeping Plaintiff apprised accordingly. *See* [Doc. 26-1 at ¶ 17 ("FAW acted as the middle man and controlled the process."); Doc. 27-3 at 2 (FAW relaying Spoiled Rotten's concerns to Plaintiff)]; *cf. also Greenway Nutrients, Inc. v. Blackburn*, 33 F.

Supp. 3d 1224, 1238 (D. Colo. 2014) ("The purchase of product for the [p]laintiff's benefit is an activity directed at a resident of Colorado.").  Now, MKB alleges reputational harm and loss of its customers in its capacity as a Colorado business.  *See* [Doc. 11 at ¶¶ 53, 85].  FAW thus "made a voluntary and informed decision to pursue a relationship with" MKB, a Colorado business.  *Art of Manliness, LLC v. UrbanDaddy, Inc.*, 478 F. Supp. 3d 1191, 1200 (N.D. Okla. 2020).  "[T]he scope and length of the agreement along with the parties' course of dealing suggest that Defendant intended to engage in a significant amount of business with . . . Plaintiff's Colorado-based business."  *Oaster v. Robertson*, 173 F. Supp. 3d 1150, 1164 (D. Colo. 2016); *see also id.* ("Plaintiff and Defendant did not agree to work on one project together and go their separate ways.").[4]  When issues arose, FAW sought to keep working with MKB and even arrange a third batch of clothing for shipment to Colorado.  *See Pro Axess, Inc.*, 428 F.3d at 1278 n.5 (focusing on "contacts that occurred while [the parties] were building a business relationship, maintaining that relationship, and attempting to salvage that relationship" as "indicative of purposeful availment").

Beyond fulfilling a one-off order or making an informal business connection, FAW commenced a sustained relationship premised on improving a Colorado business's operations in Colorado and elsewhere in exchange for that Colorado business's periodic payments, and through contracting and communicating with Plaintiff in Colorado, as well as facilitating shipments of clothing to Colorado.  That relationship commenced when Ms. Stone met Ms. Daal at the textile convention and continued through the events that culminated in the filing of this action, approximately eighteen months later.  The PM Contract bore a "substantial connection" to

---

[4]  The Court respectfully disagrees, at least at this stage, with FAW's "single project" characterization of its relationship with MKB.  [Doc. 30 at 8].

Colorado.  *See TH Agric. & Nutrition, LLC*, 488 F.3d at 1288.  Considering its nature and scope, "[i]t should not be a surprise" to FAW "that this continuing relationship and the resulting obligations to plaintiff subjects [it] to regulations and sanctions in Colorado for the consequences of [its] alleged activities."  *AST Sports Sci., Inc.*, 514 F.3d at 1059–60; *see also Benton*, 375 F.3d at 1077 ("By engaging in a business relationship with Mr. Benton, who operates his business from Colorado, Cameco purposefully availed itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." (cleaned up)).  The Parties' negotiations, contemplated future consequences, contractual terms, and course of dealing all support this conclusion.  *Cf. Benton*, 375 F.3d at 1077 ("[T]he correspondence exchanged between Cameco and Mr. Benton during the negotiation of the MOU provides additional evidence that Cameco pursued a business relationship with a Colorado business.").

The Court recognizes that FAW has no business operations in Colorado, no agent of FAW is alleged to have physically entered Colorado, the PM Contract selected New Jersey law, and the Parties' relationship, at its longest, was closer to one year than to several.  But the personal jurisdiction analysis is not mechanical or automatically tipped by any one factor.  "[T]he mere quantum of contacts between the forum and defendant is not determinative.  Rather, the quantity of the contacts, their significance to the venture, and the overall purpose of the parties' efforts all factor into an assessment of the sufficiency of the contacts."  *G & G Int'l, LLC v. Camsing Co., LLC*, No. 09-cv-00366-MSK-MEH, 2010 WL 466812, at *2 (D. Colo. Feb. 9, 2010).  Here, the Court is respectfully convinced that the nature of FAW's sustained contacts with MKB and the forum amount to purposeful availment for minimum contacts analysis, particularly considering Plaintiff's "light" burden at this procedural posture.  *See AST Sports Sci., Inc.*, 514 F.3d at 1056. Unlike in *Walden v. Fiore*, 571 U.S. 277 (2014), which FAW relies on, FAW had extensive

contacts with Colorado throughout its relationship with MKB.  *See id.* at 290 ("The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way.").  Here, FAW's contacts with the forum are neither fortuitous, random, nor attenuated.  *See Burger King Corp.*, 471 U.S. at 475.  And FAW's contacts plainly give rise to MKB's breach of contract claim.  That leaves only the issue of whether the exercise of personal jurisdiction would offend traditional notions of fair play and substantial justice.

FAW argues that, although the PM Contract did not contain a venue provision, it selected New Jersey law, and "the principal witnesses" (Ms. Daal, Ms. Kaye, and Mr. Beroff) are all from New York or New Jersey.  [Doc. 20 at 11–12]; *see also* [*id.* at 12 ("No doubt Plaintiff brought this action in Colorado on the most tenuous of threads in order to inconvenience the defendants in the hope they would capitulate instead of defending themselves.")].  MKB responds that FAW "maintained sustained contacts for the purported benefit of MKB's specialized needs," directly harming MKB, so it is "not unreasonable or unfair for FAW to be hauled before a Court in Colorado for this contractual activity."  [Doc. 26 at 7].

Although not phrased in doctrinal terms, FAW's arguments seem to get at the factors concerning the burden on the Defendant and the interests of the various potential fora.  *See OMI Holdings, Inc.*, 149 F.3d at 1095.  Notably, as FAW recognizes, the choice of law and dispute resolution provisions in the PM Contract, [Doc. 11-1 at 3–4], do not specify a venue.[5]  The Court

---

[5] The PM Contract appears to contain a mandatory mediation clause.  *See* [Doc. 11-1 at 3 ("If [a dispute] is not resolved by negotiation the parties agree to submit any controversy or dispute to mediation.")].  MKB alleges that "FAW has refused to schedule this dispute for mediation despite repeated demand."  [Doc. 11 at ¶ 78].  Taking that allegation as true undermines FAW's argument with respect to both the burden it faces and the interest another forum, presumably New Jersey, would have in hearing a case that FAW appears to have contracted out of the judicial system.

will not invent such a clause where none exists, and notes that courts routinely apply the law of other jurisdictions consistent with choice of law provisions like that in the PM Contract. Turning to the burden on FAW, the Court recognizes the potential of a general burden on out-of-state witnesses, but finds that any burden is not inordinate considering the nature of contemporary litigation. *See Dudnikov*, 514 F.3d at 1081 ("As in any case in which the parties reside in different fora, one side must bear the inconvenience of litigating 'on the road.' While admittedly a burden, defendants have not indicated that their defense of this case would be hindered by the territorial limits on the Colorado district court's power to subpoena relevant witnesses, or indeed hampered in any other significant way."). Indeed, FAW has not moved for a transfer of venue based on forum non conveniens. *See generally* [Doc. 20]. Moreover, other potential witnesses and evidence reside in the forum, as MKB is a Colorado business. *See* [Doc. 27 at 7]. And the Court must consider other factors, such as "the plaintiff's interest in receiving convenient and effective relief." *OMI Holdings, Inc.*, 149 F.3d at 1095. On balance, the Court does not find that FAW has shown that exercising personal jurisdiction over FAW would offend traditional notions of fair play and substantial justice. The FAW Motion to Dismiss is respectfully **DENIED**.

## III.    Spoiled Rotten Motion to Dismiss

Spoiled Rotten argues that the Court lacks specific personal jurisdiction because its "only contacts with Colorado were sporadic communications with a Colorado corporation and shipments of clothing to Colorado." [Doc. 25 at 3].[6] MKB responds that "Spoiled Rotten's contacts with MKB, and by extension, Colorado, were not random or one-off contacts," and "Spoiled Rotten's conduct and intentions contemplated a sustained relationship with a Colorado company." [Doc.

---

[6] In citing the Spoiled Rotten Motion to Dismiss, the Court uses the page numbers assigned by this District's Case Management/Electronic Case Filing ("ECF") system.

27 at 6].  For reasons similar to those discussed in the context of the FAW Motion to Dismiss, the Court respectfully disagrees with Spoiled Rotten.

The following contacts with Colorado are supported by Plaintiff's allegations, taken as true, and the materials submitted in connection with the FAW and Spoiled Rotten Motions to Dismiss.  Pursuant to the PM Contract, FAW connected MKB with Spoiled Rotten for purposes of manufacturing children's clothing.[7]  On behalf of Spoiled Rotten, Mr. Beroff communicated with Ms. Stone in connection with filling custom product orders for MKB over a period of several months, and in view of a longer relationship.  *See, e.g.*, [Doc. 20-4 at 2 ("I look forward to working together.  We are here to help, however we can."); Doc. 27-1 at ¶ 12 ("Mr. Beroff also mentioned, both directly to [Ms. Stone] and through FAW, that he looked forward to working with MKB.")].[8]  MKB "ship[ped] to Mr. Beroff various physical components needed to manufacture" the clothing.  [Doc. 27-1 at ¶ 5]; *see also* [Doc. 27-2 at 2–3].  Spoiled Rotten sent the First and Second Shipments to MKB in Colorado and solicited payments in return.  *See, e.g.*, [Doc. 11 at ¶¶ 41–42, 63; Doc. 20-4 at 3–5].  The payments made by MKB amounted to around $100,000.  *See* [Doc. 11 at ¶¶ 35, 58].  When MKB decided not to proceed with additional orders following the Second Shipment, "Mr. Beroff reached out to [Ms. Stone] directly by both phone and email in what [she] viewed as an attempt to salvage the business relationship."  [Doc. 27-1 at ¶ 13]; *see also* [Doc. 27-4 at 3].  In

---

[7] Spoiled Rotten considers it undisputed that it did not have a written contract with either FAW or MKB.  *See* [Doc. 25-1 at ¶ 14; Doc. 31-1 at ¶ 4]; *see also* [Doc. 31 at 3 n.2].  Of course, not all contracts need be written, and the existence of an enforceable contract is a question of law that is premature at this stage.  Plaintiff has sufficiently alleged that, pursuant to an agreement with FAW, Spoiled Rotten filled manufacturing orders, and Spoiled Rotten's evidence concerning the nonexistence of long-term written agreements is not to the contrary.

[8] Making inferences in Plaintiff's favor, and considering the other evidence Plaintiff has submitted about its relationship with Spoiled Rotten, representations such as this must contradict, and at this procedural posture override, the attestation by Mr. Beroff that "[a]part from manufacturing the specific clothing ordered by [MKB], Spoiled Rotten did not envision a long-term, ongoing, continuous business relationship with [MKB]."  [Doc. 25-1 at ¶ 15]; *see also* [Doc. 31 at 4–6].

evaluating the Spoiled Rotten Motion to Dismiss, the Court also credits Spoiled Rotten's representations that it has had no business presence in Colorado other than its dealings with MKB, and that the contents of the First and Second Shipments were manufactured in New York. *See generally* [Doc. 25-1].

With respect to Spoiled Rotten and MKB, the Court again finds that the Complaint alleges sufficient facts to demonstrate "that the parties pursued a continuous course of dealing." *AST Sports Sci., Inc.*, 514 F.3d at 1059. Importantly, their relationship was not based on "a one-off purchase of a product via the internet." *BlueRadios, Inc. v. Datacolor, Inc.*, No. 19-cv-00341-REB-NRN, 2019 WL 1596123, at *7 (D. Colo. Apr. 12, 2019). Rather, MKB's relationship with Spoiled Rotten consisted of a series of sizable transactions conducted over a period of months, each involving the flow of significant funds and fabric between the forum and Spoiled Rotten. Ms. Stone and Mr. Beroff engaged in steady and consistent communications along the way—hardly amounting to a "dearth" of communications, as Spoiled Rotten suggests. *See* [Doc. 31 at 7 (quotation omitted)]. As a result of those communications, the First and Second Shipments were sent to Colorado, the forum state. It is also significant that Spoiled Rotten tried to keep working with MKB as their relationship broke down by directly soliciting MKB to purchase additional clothing for shipment to Colorado. *See Pro Axess, Inc.*, 428 F.3d at 1278 n.5.

Spoiled Rotten's contacts with Colorado are therefore not fortuitous, random, or attenuated, *see Burger King Corp.*, 471 U.S. at 475, as they might have been if MKB had simply ordered from Spoiled Rotten's website, or if Spoiled Rotten's contacts with respect to the manufacture of goods for MKB were exclusively or primarily with FAW or its agents, or if (contrary to how the evidence must be interpreted at this phase) Spoiled Rotten did not contemplate a continuing commercial relationship with MKB. Rather, the contacts evidenced by the record

suggest that MKB and Spoiled Rotten contemplated "a continuing business relationship." *AST Sports Sci., Inc.*, 514 F.3d at 1059 (quotation omitted). And all purchase orders generated in connection with the First and Second Shipment, *see, e.g.*, [Doc. 20-4 at 13], bore a "substantial connection" with the forum state, as their customized contents were destined for MKB's Colorado-based boutique business. *See TH Agric. & Nutrition, LLC*, 488 F.3d at 1288. Considering Plaintiff's "light" burden at this point, *see AST Sports Sci., Inc.*, 514 F.3d at 1056, the Court finds that sufficient minimum contacts with Colorado give rise to Plaintiff's claims against Spoiled Rotten in connection with the First and Second Shipments, such that specific personal jurisdiction over Spoiled Rotten exists.

Spoiled Rotten argues that this case is closer to *Old Republic Insurance Co. v. Continental Motors, Inc.* than it is to *Burger King Corp. v. Rudzewicz*, and therefore minimum contacts are lacking. *See* [Doc. 31 at 6–7]. The Court certainly agrees that this case falls between those two precedents, as far as the factual record is concerned, but respectfully disagrees as to the legal conclusion drawn by Spoiled Rotten from those cases.

In *Old Republic*, the Tenth Circuit found no minimum contacts where an insured's payments to access the defendant's online aircraft manual repository (and other miscellaneous benefits) "created at most one-year agreements with minimal obligations." 877 F.3d at 911. The court found that "the absence of prior negotiations, long-term contractual commitments, or any significant course of dealing distinguish[ed] this case from previous cases finding purposeful direction under the continuing relationships framework." *Id.* at 910. But in *Old Republic*, the insurer demonstrated no "solicitations or direct communications . . . that suggest[ed] purposeful direction" by the defendant, *id.* at 912, and the subscription at issue cost a few hundred dollars annually, *id.* at 901 n.4. Here, in contrast, Spoiled Rotten contacted the forum directly and

repeatedly through communications with Ms. Stone, and the volume and nature of the business involved suggests a far more significant relationship, for purposes of minimum contacts, than the one in *Old Republic*. Although *Burger King Corp.* concerned a 20-year franchise agreement, and the relationship between Spoiled Rotten and MKB would more accurately be measured in months, the Supreme Court stressed in *Burger King Corp.* that the "quality and nature of [the franchisee's] relationship to the [franchisor headquarters] can in no sense be viewed as random, fortuitous, or attenuated." 471 U.S. at 480 (quotation omitted). So too here. The relationship between MKB and Spoiled Rotten was significant and sustained: Mr. Beroff needed MKB's funds "to pay his workers," [Doc. 27-3 at 2], and he emailed and called Ms. Stone directly when she decided not to proceed with another shipment, [Doc. 27-1 at ¶ 13].[9] In any case, duration aside, *Burger King Corp.* plainly instructs that "even a single act can support jurisdiction." *Burger King Corp.*, 471 U.S. at 475 n.18. After analyzing Spoiled Rotten's acts, specifically its contacts with the forum, the Court finds that Plaintiff has demonstrated purposeful availment.

Turning to whether exercising specific personal jurisdiction would offend traditional notions of fair play and substantial justice, Spoiled Rotten argues, paralleling FAW's briefing, that it would be burdened because it is based in New York, alongside the witnesses and evidence in this matter. *See* [Doc. 25 at 9]. Spoiled Rotten adds that Plaintiff would not be prejudiced by

---

[9] Spoiled Rotten also argues that the "drop-shipping relationship" supposedly at issue here, "where the middleman (Fashion Angel) sells a product to a consumer (the Boutique), and then the manufacture[r] (Spoiled Rotten) ships the product to the consumer," cannot create "personal jurisdiction over the manufacturer in the consumer's home state." [Doc. 31 at 7]. For support, Spoiled Rotten cites *Admar International, Inc. v. Eastrock, L.L.C.*, 18 F.4th 783, 788 n.1 (5th Cir. 2021). But that case does not stand for Spoiled Rotten's desired proposition, and this Court agrees with the Fifth Circuit's observation in *Admar* that "delivery of a single $13 product" to a nonparty customer in the forum state on behalf of an intermediary "is the type of isolated act that does not create minimum contacts." *Id.* Here, in contrast, Spoiled Rotten shipped nearly $100,000 in goods directly to Plaintiff in the forum state.

litigating in New York. *See* [*id.*]. MKB responds that much of the evidence can be found in Colorado, such as the defective children's clothing it has been storing. *See* [Doc. 27 at 7]. For the reasons discussed above with respect to FAW, the Court finds that exercising personal jurisdiction is permissible under these circumstances. *Cf. Dudnikov*, 514 F.3d at 1081. The Spoiled Rotten Motion to Dismiss is respectfully **DENIED**.

**CONCLUSION**

For the foregoing reasons, it is **ORDERED** that:

(1)     The Motion to Dismiss for Lack of Personal Jurisdiction [Doc. 20] filed by Fashion Angel Warrior, LLC is **DENIED**; and

(2)     The Motion to Dismiss for Lack of Personal Jurisdiction [Doc. 25] filed by Spoiled Rotten U.S.A., Inc. is **DENIED**.

DATED: November 16, 2023                    BY THE COURT:

_____
Nina Y. Wang
United States District Judge